UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | Case No. 24-cr-00036 (LLA) |
| v. | |
| **DREW MASON,** | |
| Defendant. | |

### GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

Mr. Mason appears before the Court for sentencing, after his possession of distribution amounts of drugs while also in possession of an illegal explosive device. The offense for which he pled guilty is undoubtedly serious. And his compliance with this Court's supervised release was abysmal. Mr. Mason's conduct is mitigated by his young age, lack of criminal history, and the serious injuries he received as the victim of a shooting while on release in this case. Mr. Mason also accepted responsibility for his conduct in this case at the first opportunity. Given his injuries, it seems unlikely that Mr. Mason will present a significant danger to our community. Considering that, the Court should impose a probationary sentence to provide Mr. Mason structure and programming to continue his rehabilitation.

For the following reasons, the Government recommends a sentence of two years of probation.

### BACKGROUND

*The Instant Offense*

On Thursday, July 13, 2023, at 3:58 PM, Metro Transit Police (MTPD) was alerted by the station manager at the Rhode Island Avenue Metro Station that an individual was potentially getting robbed.

MTPD reviewed surveillance video and observed that a group of young men were surrounding another man. One of the young men—later identified as Drew Mason—took money from the individual, before running away. Based on the video, Mason was black, wearing a white shirt and black pants, with short twist hair, and a black and gray backpack.

*Figures 1 and 2, Mason Circled in Red and Robbery Victim in Yellow*



Surveillance video reflected that as MTPD responded, Mason walked over to a foot bridge next to the metro station. Mason walked towards a stairway carrying his backpack and then disappeared from view. He reemerged shortly afterwards without a backpack. He also changed his shirt after tossing the backpack.

*Figure 3: Mason Before Tossing Backpack; Figure 4: Mason After Tossing Backpack*



MTPD officers responded to the scene, located Mr. Mason, and stopped him to determine if they could find the individual who had witnessed the robbery or the individual from whom the money was taken. Notably, Mr. Mason did not have his backpack on when MTPD officers arrived.

      An MTPD officer began looking for the backpack around the foot bridge where Mr. Mason was located. MTPD found the backpack behind some bushes. The recovering MTPD officer opened and checked the backpack because it was an unattended item next to the Metro station. Inside the backpack, MTPD found a large amount of cash and a large amount of what appeared to be marijuana. He did not immediately notice the explosive device.

      Meanwhile, Mason was released because no witness or victim could be found. Despite being released, Mason returned to the scene, approached the MTPD officer who had retrieved his backpack, and insisted multiple times that it was his backpack and also correctly stating that his debit card was inside the backpack. Mason even called his mother in an attempt to have her verify that the backpack belonged to him.

      The backpack was subsequently searched and inventoried. Inside the backpack was

$607.05 in multiple denominations, a large plastic bag containing 3.704 ounces of marijuana, nine pre-packaged bags in various flavors labeled "Cannabis Flower," each weighing 0.125 ounces (total 1.125 ounces), multiple smaller clear plastic baggies, and a digital scale.

*Figure 5: Marijuana, Cash, Scale*



### The Explosive Device

Additionally, inside the backpack was an apparent explosive device. ATF analyzed the device which was a brown cardboard tube approximately 2.5 inches long, 1.24 inches in diameter, and weighing 24.5 grams. The carboard tube was sealed with glue with a red fuse extending from one end.

*Figures 6 and 7*



ATF disassembled the device revealing that it contained 6.2 grams of a dark grey powder which was determined to be an explosive mixture containing potassium perchlorate and aluminum (commonly known as flash powder). The legal limit for possessing flashpowder is fifty milligrams. Therefore, this device contained 124 times the legal limit for flashpowder. A device like this is not legally or commercially sold.

    Mr. Mason was initially charged in D.C. Superior Court with a local drug charge. He was not charged in relation to the explosive device. On January 18, 2024, Mason was indicted on three charges: (1) Unlawful Possession with Intent to Distribute a Detectable Amount of Marijuana, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(D); (2) Carrying an Explosive During Commission of a Federal Felony, in violation of 18 U.S.C. § 844(h)(2); and (3) Unlawful Receipt of Explosives, in violation of 18 U.S.C. § 842. On February 5, 2024, Mason went to MTPD headquarters to obtain his property back following the voluntary dismissal of the D.C. Superior Court charge. He was

arrested.

After being arrested, Mason demanded to know why he was being charged. An agent stated that he was being charged in relation to explosives. In response, Mason acknowledged that an explosive device was in his backpack, he had purchased the device from someone on the street and that he had not even used the device before he was arrested at the Metro.

Mr. Mason was released to home detention pending trial in this matter. Mr. Mason was not compliant with the conditions of his release. He routinely violated his conditions by, among other things, leaving his home and traveling around Washington, D.C. late at night or early in the morning. On May 1, 2024, while violating his conditions of release, at around 1:30 AM, Mr. Mason was shot multiple times on Kendall Street NE.

On May 20, 2025, Mr. Mason pled guilty to a single count of Unlawful Possession with Intent to Distribute a Detectable Amount of Marijuana, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(D)

### *The Presentence Investigation Report*

The Presentence Investigation Report (PSIR) summarizes Mr. Mason's history. ECF No. 43. Mr. Mason is 22 and was born and raised in the Washington, D.C. area. PSIR at 2, ¶¶ 46-47. He was raised primarily by his mother and aunt. PSIR at ¶¶ 48-53. His father was arrested and has been detained since he was a child. PSIR at ¶¶ 48-49. Mr. Mason is a high school graduate. PSIR at ¶ 68. He has previously been employed in several positions including as a cashier, stocker, and most recently as an asset protection associate. PSIR at ¶¶ 72-74. Mr. Mason does not have any adult convictions. He denied have any mental, emotional, or substance abuse issues. PSIR at ¶¶ 63-67.

## ARGUMENT

Although the Sentencing Guidelines are advisory, under *United States v. Booker*, a sentencing court "must consult those Guidelines and take them into account when sentencing." 543 U.S. 220, 264 (2005); *United States v. Brown*, 892 F.3d 385, 399 (D.C. Cir. 2018). The Supreme Court has noted that while the Guidelines provide "the starting point and the initial benchmark" for sentencing, the district court should consider all the § 3553(a) factors. *Gall v. United States*, 552 U.S. 38, 49–50 (2007). The Guidelines' recommended sentencing range will ordinarily "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Kimbrough v. United States*, 552 U.S. 85, 108–09 (2007).

The listed factors in 18 U.S.C. § 3553(a) include the following:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed –
>   (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>   (B) to afford adequate deterrence to criminal conduct;
>   (C) to protect the public from further crimes of the defendant; and
>   (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence and the sentencing range established for –
>   (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines –
>     (i) issued by the Sentencing Commission . . .; and
>     (ii) that, . . . are in effect on the date the defendant is sentenced; . . .
>
> (5) any pertinent policy statement –
>   (A) issued by the Sentencing Commission . . . and (B) that, . . . is in effect on the date the defendant is sentenced.
>
> (6) the need to avoid unwarranted sentence disparities among defendants with

similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

But the Sentencing Guidelines are only "the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). They "are not the only consideration." *Id.* A sentencing judge "should . . . consider all of the § 3553(a) factors," and "[i]n so doing, . . . may not presume that the Guidelines range is reasonable." *Id.* at 50. "[I]t is not error for a district court to enter sentencing variances based on factors already taken into account by the Advisory Guidelines, in cases in which the Guidelines do not fully account for those factors, or when a district court applies broader § 3553(a) considerations in granting the variance." *United States v. Ransom*, 756 F.3d 770, 775 (D.C. Cir. 2014) (citation and internal quotation marks omitted).

In doing so, "the district court can rely on hearsay as evidence for its findings." *United States v. Miller*, 35 F.4th 807, 818 (D.C. Cir. 2022). *See also United States v. Jones*, 744 F.3d 1362, 1368 (D.C. Cir. 2014) ("Clear precedent permits hearsay to be used in sentencing decisions."). And the sentencing court can consider conduct by a defendant that was not charged or even for which a defendant was acquitted. *See United States v. Settles*, 530 F.3d 920, 923 (D.C. Cir. 2008) ("[L]ong-standing precedents of the Supreme Court and this Court establish that a sentencing judge may consider uncharged or even acquitted conduct in calculating an appropriate sentence, so long as that conduct has been proven by a preponderance of the evidence and the sentence does not exceed the statutory maximum for the crime of conviction.").

### THE APPLICABLE SENTENCING GUIDELINES

The PSIR estimates Mr. Mason's offense level to be 6 and his criminal history category to be 0, yielding a Guidelines imprisonment range of zero to six months' imprisonment, though a

probationary sentence is also Guidelines compliant. PSIR at ¶¶ 84-85. Additionally, the PSIR reflects a Guidelines range of two to three years of supervised release and a fine of $1,000 to $9,500. PSIR at ¶¶ 88-90, 100-102. The Government agrees with these calculations.

### THE GOVERNMENT'S SENTENCING RECOMMENDATION

The Government recommends that the Court sentence Mr. Mason to two years of probation. This sentence captures the nature of his offense, provides Mr. Mason with structure and programming to avoid future offenses and continue his recovery, and will serve as an adequate deterrent. This sentence also reflects the unique circumstances of this case and Mr. Mason's significant injuries due to a shooting.

I.  **The Nature and Circumstances of this Offense Merits Probation.**

Mr. Mason engaged dangerous and illegal conduct. He was carrying an illegal explosive device while engaged in the distribution of marijuana. He did so in and around a heavily trafficked public transportation hub at the the Rhode Island Avenue Metro station. Thousands of people enter that Metro station every day.[1] Many thousands more make use of the bus station and parking available there. Within eyeshot of the Metro is a movie theater, indoor skating and pickleball courts, a food hall, and a DMV outpost. Despite knowing that he had that explosive device in his backpack, Mr. Mason callously and recklessly tossed it behind some bushes to avoid arrest. Anyone could have found that backpack and the explosive device.

Fortunately, no one was injured during Mr. Mason's offense. And while Mr. Mason was carrying drugs with the purpose of distributing them, there is nothing to suggest that Mr. Mason is

---

[1] Daily ridership statistics are available on WMATA's website, available at https://www.wmata.com/initiatives/ridership-portal/daily-summary.cfm

a prolific or violent drug distributor.

Ultimately, the nature and circumstances of this offense are consistent with a probationary sentence.

### II.     Mr. Mason's History and Characteristics.

Mr. Mason does not have significant criminal history. He has no scored adult convictions. Mr. Mason's behavior while on supervised release in this case, however, was troubling. He repeatedly flaunted this Court's orders as to home detention, ignoring pre-trial services, and going where he wanted whenever he wanted. At the same time, Mr. Mason has suffered significantly because of his decision to violate his release conditions on May 1, 2024. Given the serious and debilitating nature of his injuries, his life will never be the same. His injuries will undoubtedly hamper his ability to maintain employment. Those same injuries also somewhat mitigate concerns about future offenses.

The Government is concerned that Mr. Mason was charged with a new offense recently, despite his injuries. Ultimately, the nature of that offense—and the fact that it remains unproven—are not enough to justify a term of incarceration in this case.

### III.    The Need for the Sentence Imposed.

The requested sentence is sufficient but no greater than necessary to meet the goals of sentencing. Under the circumstances, it provides specific deterrence: it will allow the Court to monitor Mr. Mason as he recovers and hopefully avoids future offenses. It provides general deterrence: it will signal to the community that the possession of drugs and explosives is a serious matter and hopefully deter others from doing so. It will also provide structure and programming for Mr. Mason to continue his rehabilitation. The requested sentence of two years' probation is a

reasonable one that secures the goals of justice.

## CONCLUSION

For all the foregoing reasons, the Government respectfully requests that the Court impose a sentence of two years' probation.

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

*/s/ Cameron A. Tepfer*
Cameron A. Tepfer
D.C. Bar No. 1660476
Assistant United States Attorney
United States Attorney's Office
601 D. Street, NW
Washington, DC 20579
202-258-3515
Cameron.Tepfer@usdoj.gov